**EXHIBIT A**
**Robert J. Sayre**

I will express the following opinions at the trial of this matter on the basis and for the reasons set forth below as fully detailed in the documentation identified below. I can provide additional information in support of the points, below, and on additional patent applications assigned to AGS and ~~Tenax~~ if needed. Accordingly, I reserve the right to supplement this report as well as respond to the reports of others.

**Subject Matter A**

United States Patent and Trademark Office Procedures

**Summary of the Opinion**

I will testify regarding procedures and practices when prosecuting patent applications at the United States Patent and Trademark Office, including but not limited to standards of patentability, the nature of proceedings before the United States Patent and Trademark Office, and the duty of candor and good faith owed by applicants and their representatives before the United States Patent and Trademark Office.

**Basis for the Opinion**

These opinions are based on my experience, including, but not limited to, my experience as a registered patent attorney drafting and prosecuting US patents, my experience as a patent-drafting instructor for the World Intellectual Property Organization, my legal education at Duke University School of Law and my study of the United States Patent and Trademark Office Manual of Patent Examining Procedures (MPEP).

REPORT OF ROBERT J. SAYRE, ESQ., PURSUANT TO RULE 26(A) OF THE          1
FEDERAL RULES OF CIVIL PROCEDURE

## Substance of the Opinion

1.  The United States Patent and Trademark Office was established by Congress to administer the patent system contemplated by the US Constitution. A principal function of the United States Patent and Trademark Office is to scrutinize patent applications in view of the statutory requirements for patentability and make consistent, objective decisions regarding whether each patent application meets those requirements. The United States Patent and Trademark Office is staffed by patent Examiners (*i.e.*, individuals who have both technical and patent law training) whose job it is to review patent applications and, where warranted, to issue patents in the particular technical field to which they are assigned.

2.  Unless an inventor proceeds *pro se* (*i.e.*, represents himself or herself), a patent attorney or agent will prepare a patent application on behalf of the inventor. A patent application includes a written detailed description of the invention, which is called the "specification." The specification will often include drawings, which are used to help explain the invention. The patent application will also include one or more numbered sentences at the end of the application, which are called "claims." Patent claims set forth what the inventor regards as his or her invention and delineate the scope of patent protection to which the inventor believes he or she is entitled.

3.  A patent attorney who prepares the application is aware that he or she is obligated at all times to deal candidly and in good faith with the Patent Office. This obligation includes disclosing prior art and other information of which the attorney or agent is aware and that a reasonable Examiner would want to know when considering whether or not to allow the claims. Prior art and other information that a reasonable Examiner would want to know when assessing patentability is termed "material" information. A patent attorney or agent understands that there is a duty to disclose all material information that is not cumulative to that in possession of the Examiner. The attorney or agent also understands there is a duty to submit the *most* material information—not just some of the information of lesser materiality. This duty of candor and good faith to the United States Patent and Trademark Office also extends to the inventor and others associated with the filing and prosecution of the patent

application. Fulfillment of the duty of candor often takes the form of: (1) a description of prior practices in the body of the specification or (2) a separate document, often referred to as an "Information Disclosure Statement," that identifies and/or explains information that the Examiner may find relevant in evaluating patentability. It is a breach of this duty of disclosure to prosecute a patent application with reckless disregard as to the truth of statements made to the Examiner. It is also a breach of this duty of disclosure to prosecute an application knowing that the Examiner has not considered the *most* material information.

4.  The United States Patent and Trademark Office assigns each patent application to one or more Examiners with expertise in the relevant field. The Examiner then scrutinizes the application to determine whether it meets the requirements for patentability. Aspects of the process for reaching this determination are described in the following sections.

## Subject Matter B
### The Determination of Patentability

### Summary of the Opinion

I will testify that not every invention is patentable. For example, each patent application and the procedures for prosecuting the application must satisfy the requirements of Title 35 of the US Code (in particular, sections 102, 103 and 112) and Title 37 of the Code of Federal Regulations.

### Basis for the Opinion

These opinions are based on my experience, including, but not limited to, my experience as a registered patent attorney drafting and prosecuting US patents, my experience as a patent-drafting instructor for the World Intellectual Property Organization, my legal education at Duke University School of Law and my study of the Rules under Title 35 of the US Code and the MPEP.

## Substance of the Opinion

5. A patent will be denied if the named inventor(s) did not invent all of the subject matter sought to be patented. An inventor is one who conceives of subject matter claimed in a patent application.

6. A patent will be denied if an invention lacks novelty. In other words, if there is a reference in the prior art that shows or describes the claimed invention, the Examiner will not allow the claim on the ground that the invention is "anticipated." In order for a patent, publication or other prior art to anticipate an invention, all of the elements of the claimed invention must be present in a single reference asserted as prior art.

7. Just being novel, however, is not enough for an invention to qualify for a patent. A patent will also not be granted by the United States Patent and Trademark Office if the invention, despite being technically novel, is so close to the prior art that it can be said to have been an "obvious" invention in view of the prior art. The test for obviousness is whether the invention as a whole, including the differences between what is taught by the prior art and what is claimed, would have been obvious to a person of ordinary skill in the relevant art.

8. In order to obtain a patent, the patent attorney or agent has to overcome all rejections put forth by the Examiner, including whether the invention was old or obvious. This process usually requires submission of additional materials and some additional discussion between the patent attorney and the Examiner. The process is called the "prosecution" of a patent application.

## Subject Matter C
The Prosecution of a Patent Application

## Summary of the Opinion

I will testify that examination of a patent application typically includes Office Actions issued by the Examiner and Responses from the applicant, all of which is recorded in a database

at the United States Patent and Trademark Office. An Application will go abandoned if the applicant fails to respond to an Office Action.

### Basis for the Opinion

These opinions are based on my experience, including, but not limited to, my experience as a registered patent attorney drafting and prosecuting US patents, my experience as a patent-drafting instructor for the World Intellectual Property Organization, my legal education at Duke University School of Law and my study of the MPEP.

### Substance of the Opinion

9.  In most cases, the Examiner will initially reject claims as unpatentable for one or more reasons. The Examiner's letter setting forth the reasons for the rejection is called an "Office Action." If the applicant decides to continue prosecution of an application after a rejection, the patent attorney will file a Response document explaining why the invention is patentable. The attorney may also add or delete some of the patent claims or change the language of existing claims in response to objections from the Examiner. This process of Office Actions, Responses, and claim amendments is an iterative process (*i.e.*, the prosecution of a patent application can involve several such communications between the Examiner and the patent attorney). As a result, the claims that are ultimately allowed by the United States Patent and Trademark Office are often different from those that were submitted in the originally filed patent application.

10. The communications, including Office Actions and Responses, between the attorney and the Examiner (or other United States Patent and Trademark Office personnel) during the prosecution of the application are transacted in writing or committed to writing so that a record is created. These various writings, together with the original application papers make up what is called the "prosecution history" or "file wrapper" of a patent. After an application is published, documents in the file wrapper can be accessed by the general public

via the internet using the United States Patent and Trademark Office's Patent Application Information Retrieval (PAIR) database.

11. Patent attorneys and agents, as well as the inventors, are permitted to have personal or telephonic interviews with the Examiner. The Examiner prepares a written statement regarding the major points of discussion during the interview. The Examiner's written statement is known as the Examiner's Interview Summary Record. This form, when filled out, becomes part of the file.

12. A patent will be denied as a result of the application going "abandoned" if the applicant fails to respond within specified deadlines to actions from the United States Patent and Trademark Office.

13. When an applicant "unintentionally" allows a patent application to go abandoned and while the application remains unintentionally abandoned, the applicant can petition the United States Patent and Trademark Office to revive that patent application.

## Subject Matter D
The Prosecution History of US Patent Application No. 10/366,691

### Summary of the Opinion

I have reviewed the prosecution history of USSN 10/366,691, "High Friction Scrims, Geonets, Laminates and Methods for Using and Making Them," which names Peter J. Ianniello and Giovanni Capra as inventors and is assigned to Advanced Geotech Systems, LLC. I will testify, subject to the considerations, below, that people who were involved in the prosecution of this patent application (a) did not assist the United States Patent and Trademark Office in uncovering material information, even when that information was known to them prior to the initiation of the examination of a US patent application by the Examiner and (b) made an apparent misrepresentation and did not satisfy the duty of candor and good faith to the United States Patent and Trademark Office when filing a petition to revive this patent application after abandonment.

### Basis for the Opinion

These opinions are based on my review of this application and file history of this application and other patent applications, referenced below; email correspondence relating to the abandonment of this application; a press release, dated, October 9, 2009, from Syntec Corporation; and on my experience, including, but not limited to, my experience as a registered patent attorney drafting and prosecuting both US and international PCT patent applications, my experience as a patent-drafting instructor for the World Intellectual Property Organization, my legal education at Duke University School of Law and my study of the law under Title 35 of the US Code and Title 37 of the Code of Federal Regulations, as well as the MPEP.

### Substance of the Opinion

14.     US Patent Application Serial No. 10/366,691, which names Peter J. Ianniello and Giovanni Capra as inventors and is assigned to Advanced Geotech Systems LLC, was filed with the United States Patent and Trademark Office on February 14, 2003.  This application is hereafter referred to as "Ianniello '691"

15.     The United States Patent and Trademark Office mailed an Office Action to Applicants' attorney at that time, Gary L. Shaffer, on March 18, 2005.  The Office Action noted the statutory six-month deadline within which a Reply must be filed.

16.     Applicants did not file a Reply to this Office Action within the six-month period starting from the date (March 18, 2005) on which the Office Action was mailed.

17.     Consequently, the United States Patent and Trademark Office mailed to Attorney Gary L. Shaffer a Notice of Abandonment for this patent application on September 27, 2005, due to "Applicant's failure to timely file a proper reply to the Office letter mailed on 18 March 2005."

18.     Appended to the Notice of Abandonment was an Examiner-Initiated Interview Summary, prepared by Examiner Jessica L. Rossi.  Examiner Rossi reported that she placed a

courtesy call to Attorney Shaffer on 20 September 2005. Per Examiner Rossi's Interview Summary, Examiner Rossi and Attorney Shaffer spoke by telephone, and Attorney Shaffer confirmed to Examiner Rossi that no Response to the Office Action was sent, thereby allowing the application to go abandoned and acknowledging knowledge (as of 20 September 2005) of this abandonment.

19.     In my experience, it is common for an examiner to place a courtesy call as a patent application goes abandoned. The call helpfully alerts the attorney that an application is going abandoned and allows the Attorney to promptly take action to rectify the situation and, if necessary, revive the application if, in fact, the abandonment was unintentional (for example, if abandonment was due to an inadvertent docketing error using an otherwise reliable docketing system). Prompt action after becoming aware of an unintentionally abandoned application is critical because *the entire delay* in providing a response must be *unintentional* from the due date for replying to the Office Action until the filing of the petition. In this case, six months from the issuance of the Office Action passed with no reply being filed, and then almost another full year passed with no action taken to revive this patent application.

20.     A variety of email messages were sent involving officers and associates of the owner of the patent application, Advanced Geotech Systems LLC (AGS), including Cesare Beretta (President of AGS and Chairman of Tenax Corporation). Examples of these email messages include among others (i) a message, dated March 16, 2006, from Inventor Peter Ianniello (former Founder, President and CEO of AGS and former Vice President of Tenax) to Cesare Beretta and Giulio de Giuseppe (Board member of AGS and President of Tenax Corporation) noting that the Ianniello '691 application had gone abandoned, (ii) a message from Giulio de Giuseppe, dated March 29, 2006, noting the abandonment of Ianniello '691, (iii) an email message from Peter Ianniello to Cesare Beretta and Giulio de Giuseppe, dated June 19, 2006, again noting that Ianniello '691 was abandoned. Over the course of these communications, Peter Ianniello urged the revival of Ianniello '691; but AGS repeatedly declined to take action to revive the application.

21.     In view of the above-noted telephone conference between the Examiner and the Applicant's attorney at the United States Patent and Trademark Office as well as the series of above-noted communications among representatives of AGS and Tenax spanning much of the duration over which the application remained abandoned, AGS and Tenax were well aware of the abandonment of this application from the time it went abandoned up to the date, nearly a full year later (*i.e.*, on September 6, 2006) when a petition to revive for unintentional abandonment was filed.

22.     On September 6, 2006, Applicants' attorney, Gary M. Nath of Nath & Associates, filed a petition to revive the application, wherein Nath asserted the following: "The entire delay in providing this response was unintentional, from the mailing of the Office Action until the filing of this petition." The time span referenced by this language covers the date range of March 18, 2005 (the date of the Office Action) to September 6, 2006 (the date on which the petition to revive was filed). I cannot conceive of any credible circumstances under which the failure to respond or revive continued for nearly one and a half years without action, where the failure over this entire time frame could be considered "unintentional." To the contrary, the absence of any action in spite of full knowledge of the abandonment of the application (particularly as noted in the Examiner's interview summary) points overwhelmingly to the conclusion that the abandonment of Ianniello '691 was intentional. And with a false statement by Attorney Nath as to the unintentionality of the abandonment--in spite of AGS's long-standing knowledge of the abandonment--the above assertion as to the unintentionality of the abandonment in the petition to revive that was filed by Nath with the United States Patent and Trademark Office could only be construed as an intentional misrepresentation (either as to whether the abandonment was intentional or as to whether an adequate investigation was made) to mislead the United States Patent and Trademark Office into granting the petition to revive Ianniello '691.

23.     In the Decision from the United States Patent and Trademark Office granting the Petition (mailed April 18, 2007), the Petitions Examiner indicated the following:

> It is not apparent whether the person signing the statement of the unintentional delay was in a position to have firsthand or direct knowledge of the facts and circumstances of the delay at issue. Nevertheless, such statement is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay. [citations omitted] In the event that such an inquiry has not been made, petitioner must make such an inquiry. If such inquiry results in the discovery that it is not correct that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137(b) was unintentional, petitioner must notify the Office.

Notwithstanding having been put on notice of the duty to make this inquiry, AGS and Nath appear not to have notified the United States Patent and Trademark Office about the various communications regarding the abandonment of this patent application, which communications strongly counsel against a conclusion that the delay was unintentional, thereby also appearing to knowingly and intentionally breach the duty to disclose material information relating to their longstanding knowledge of the abandonment, which bears the United States Patent and Trademark Office's material determination as to whether the abandonment remained unintentional.

24.     Determination of inequitable conduct requires a two-step analysis. First, the trial court must determine whether the conduct meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO. Once the threshold levels of materiality and intent have been established, the trial court is required to weigh materiality and intent. The more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred. *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed. Cir. 2000).

25.     In this case, the materiality of the representation is critical as it is the defining factor as to whether this patent application could be revived; and intent to mislead is likewise evident in view of the protracted time over which AGS had knowledge that the application was abandoned without prior action to revive.

26.     As explained in the United States Patent and Trademark Office's Manual of Patent Examining Procedures, at section 711.03(c):

> Where the applicant deliberately permits an application to become abandoned . . . , the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as "unintentional" within the meaning of 37 CFR 1.137(b). See *In re Application of G*, 11 USPQ2d 1378, 1380 (Comm'r Pat. 1989). An intentional course of action is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken. See *In re Maldague*, 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988).
>
> . . .
>
> Likewise, a change in circumstances that occurred subsequent to the abandonment of an application does not render "unintentional" the delay resulting from a previous deliberate decision to permit an application to be abandoned. These matters simply confuse the question of whether there was a deliberate decision not to continue the prosecution of an application with why there was a deliberate decision not to continue the prosecution of an application.

*Id.*

27. Moreover, AGS and Nath in the Ianniello '691 application did not inform the United States Patent and Trademark Office about US Patent Application Serial No. 11/167,561 (published as US 2007/0183852 A1, titled, "High-Friction Geo-Textiles for Increasing the Stability of Landfill Drainage Layers and Other High-Friction Angle Installations, and Related Methods," assigned to Tenax International and naming Cesare Beretta as inventor, hereafter referred to as "Beretta '561"). The Beretta '561 application is extremely similar to and shares substantial overlap with the Ianniello '691 application. Indeed, the two patent applications share a lot of the same text, with language from Ianniello '691 reproduced verbatim in Beretta '561. Accordingly, most of the claims of Beretta '561 were rejected by the US Examiner as being anticipated by Ianniello '691, and Tenax allowed the Beretta '561 application to go abandoned. Similarly, Tenax and Gary M. Nath filed an international patent application via the Patent Cooperation Treaty (application No. PCT/US2007/0013097, published as WO/2008/150257 and again naming Cesare Beretta as inventor) that appears to be identical to the Beretta '561 US application and likewise includes text from Ianniello '691. Against this Beretta PCT application, the international examiner likewise found and cited the Ianniello '691

application as a relevant reference defeating patentability some of the claims in combination with other references.

28.     With the Tenax PCT/US2007/0013097 patent application (and any other PCT patent applications that it has filed and that remain pending), Tenax is prosecuting an international application, which, if it enters the national stage in countries across the globe may result in patents in most developed foreign countries.  Tenax's international focus beyond the United States is evident from a press release, dated October 9, 2009, announcing the transfer of assets relating to drainage nets and geocomposites from Tenax Corporation to a newly formed company, by the name of Syntec.  This press release announces that the operations of Syntec span the Americas, including the United States.  From the information supplied in the press release, it appears that Syntec is being carved out of Tenax to create a separate legal entity.  In particular, the press release promotes that Syntec includes "many familiar faces" and that "distributors and customers will notice little in the way of changes as they will continue to work with many of the same people and many of the familiar processes."  This shift in focus on behalf of Tenax to foreign markets, particularly corresponds with Tenax's filing of recent international PCT applications [including the above-referenced Tenax PCT/US2007/0013097 application as well as PCT/EP2008/064617 (published as WO/2009/056548, "Composite for Geotechnics, Building and the Like, with Permeable Layer," with Giulio de Giuseppe as the sole named inventor)], while several of the United States patent applications naming Peter Ianniello have been allowed to go abandoned.  These PCT patent applications (because they afford worldwide country designations) may allow Tenax to have worldwide exclusive rights for the sale of products that may include subject matter invented by Peter Ianniello, as specified by, *e.g.*, Ianniello US patent application number 10/366,691.

28.     Surprisingly, both the Ianniello '691 application and the Beretta '561 application were prosecuted by Gary M. Nath of Nath & Associates.  Because Nath was prosecuting two patent applications with great overlap of subject matter, there was a duty to disclose to the examiner in each of these US applications the existence, status and any rulings and citations in the other application because each examiner would likely find such information relevant [see,

*e.g., McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897 (Fed. Cir. 2007) and *Gemveto Jewelry Co. v. Lambert Bros., Inc.*, 542 F. Supp. 933 (S.D.N.Y. 1982)], though it appears that Tenax and Nath failed to inform the Examiner in each case of the other application and developments therein. It was only the Examiner who found and cited the Ianniello '691 application against the Beretta '561 application, while Nath, Tenax and Beretta apparently omitted citing the Ianniello '691 application from any of its disclosures to the United States Patent and Trademark Office.

29. A patent examiner at the United States Patent and Trademark Office would likely find the prosecution history of such a substantially similar patent application (*i.e.*, Beretta '561) to be material in examining the Ianniello '691 application. Nath should therefore have informed the United States Patent and Trademark Office in the examination of Ianniello '691 about the details of the Beretta '561 application, including citation of all rejections and references cited in the Beretta '561 application and an explanation as to how there could be no overlap in inventorship between these two applications. These issues are highly material to the determination of patentability. "As a critical requirement for obtaining a patent, inventorship is material," *PerSeptive Biosystems*. As is further noted in *PerSeptive Biosystems*, "the intentional 'misrepresentations, omissions and half-truths to the PTO,' made as a 'persistent course" of conduct, are highly material." Moreover, the intimate knowledge of both applications and all of the relevant relationships between the parties (before this court by Nath ... who was prosecuting both applications and presently is the "Third Party Administrator" for prosecuting patent applications under a December 2005 Agreement between the parties) combined with the failure to openly disclose any details of the Beretta '561 application (including the rejections made and the determination of inventorship) to the examiner in the Ianniello '691 application is strong evidence of an intent to deceive with respect to material information.

30. Under 35 U.S.C. §1.48(a), an error in inventorship in a pending patent application can only be corrected where the error arose without any deceptive intent either on the part of the person named as an inventor in error or on the part of the person who through error was not named as an inventor. Likewise, to the extent that fewer than the true inventors are

named on an issued patent, the patent may be corrected to reflect non-joinder so long as there was no deceptive intent. However, even an innocent inventor cannot enforce a patent that is deemed unenforceable through the inequitable conduct of the named inventors. *Frank's Casing Crew v. PMR Tech., Ltd.,* 292 F.3d 1363, 1376-77 (Fed. Cir. 2002). Consequently, the deceptive misrepresentation as to inventorship can render a patent resulting from either application unenforceable.

31. Nath's duty of confidentiality to both AGS and Tenax does not absolve him of his duty to disclose the particulars of each case in the other. This situation is noted in J. McCauley, "Eye of the Beholder: Client Perceptions of Ethical Issues in Intellectual Property Law," Virginia Bar Association, Intellectual Property and Information Technology Law Section (Panel Discussion) (January 18, 2003), which discusses a similar situation as follows:

> An extremely difficult conflict of interest can arise where a law firm has two clients seeking related patents. Under the PTO Rules, 37 C.F.R. § 1.56, a lawyer for an applicant must be disclose all "prior art" in the applicant's field. When considering the applications initially, however, the competing applications are confidential and the law firm would be obligated under ABA Rule 1.6 to protect the information contained in each application as confidential. ***In one case, while recognizing the law firm's dilemma, the court held that the failure to disclose the application of one client in the application of the other was "inequitable conduct" that rendered the issued patent invalid and unenforceable.*** Molins PLC v. Textron, Inc., 48 F.3d 1172 (Fed. Cir. 1995)."

*Id.* at 26 (emphasis added). In this case, it does not appear possible for Nath to fairly and unequivocally advance the best interests of all involved parties whose interests he represents and is obligated to promote while still satisfying the duty of disclosure. In such a case, a patent attorney should decline or withdraw from representing one or both of the parties with conflicting interests.

32. In *Aptix Corporation v. Quickturn Design Systems, Inc.*, 269 F.3d 1369 (Fed. Cir. 2001), the Federal Circuit held that litigation misconduct relating to a patent made the case exceptional under 35 U.S.C. § 285, and thus warranted a full compensation of reasonable attorney fees and costs. The *Aptix* holding also established that misconduct regarding a patent could be deemed to be "unclean hands" in the court proceeding. The *Aptix* court further held

that inequitable conduct before the United States Patent and Trademark Office could render a patent "unenforceable" whereas with litigation misconduct, courts have only held that the malfeasant who committed the misconduct should be denied relief. The *Aptix* court thus indicated that the remedies for litigation misconduct differ from the remedies for misconduct in acquisition of a property right; while inequitable conduct before the PTO renders the patent unenforceable by any party, the unclean hands doctrine bars only the offending party. Consequently, inequitable conduct perpetrated by Nath, AGS and/or Tenax in the prosecution of this application can render any patent issuing from the Ianniello USSN 10/366,691 application unenforceable, though the unclean hands of Nath, AGS and/or Tenax in this case as a result of the inequitable conduct should only render Nath, AGS and/or Tenax liable in this litigation.

33. Under an earlier Federal Circuit decision, a court may decide a claim for attorneys' fees under 35 U.S.C. § 285 after a dismissal with prejudice [Tenax Corp. v. Tensar Corp., 22 U.S.P.Q.2d 1264, 1267 (D. Md. 1991), wherein attorneys fees were assessed against this same Tenax Corporation after they were found guilty of inequitable conduct in an earlier patent infringement case]. Because Tenax Corporation was aware of the rules and implications of inequitable conduct based on this earlier case, knowledge and intent of the wrongdoing on behalf of Tenax Corporation, whose officers were engaged in the discussions and actions surrounding the abandonment of Ianniello '691, can readily be inferred.

## Subject Matter E
The Prosecution History of US Patent Application No. 10/366,692

### Summary of the Opinion

I have reviewed the prosecution history of USSN 10/366,692. I will testify, subject to the considerations, below, that people who were involved in the prosecution of this patent application (a) did not assist the United States Patent and Trademark Office in uncovering material information, even when that information was known to them prior to the initiation of

the examination of a US patent application by the Examiner and (b) made an apparent misrepresentation and did not satisfy the duty of candor and good faith to the United States Patent and Trademark Office when filing a petition to revive this patent application after abandonment.

### Basis for the Opinion

These opinions are based on my experience, including, but not limited to, my review of the file history of this application and email correspondence relating to its abandonment, my experience as a patent drafter and prosecutor, as a patent-drafting instructor for the World Intellectual Property Organization, and my education at Duke University School of Law and my study of the law under Title 35 of the US Code and Title 37 of the Code of Federal Regulations, as well as the MPEP.

### Substance of the Opinion

34.     USSN 10/366,692 (published as US 2003/0224143 A1, titled "Fuzzy Woven Layers, Geocomposite Laminates Incorporating Them, and Related Matters," with inventors Peter J. Ianniello and Giovanni Capra, hereafter referred to as "Ianniello '692") was filed with the United States Patent and Trademark Office on February 14, 2003—*i.e.*, the same day that USSN 10/366,691 was filed.

35.     The United States Patent and Trademark Office mailed an Office Action to Applicants' attorney at that time, Gary L. Shaffer, on August 11, 2005.  The Office Action noted the statutory six-month deadline for filing a Reply.

36.     Applicants did not file a Reply to this Office within the six-month period from the mailing date of August 11, 2005.

37.     Consequently, the United States Patent and Trademark Office mailed to Attorney Gary L. Shaffer a Notice of Abandonment of this patent application on April 13, 2006, due to "Applicant's failure to timely file a proper reply to the Office letter mailed on 11 August 2005."

38. Three months passed after abandonment of the Ianniello '692 application before Applicants' attorney, Gary M. Nath, filed a petition to revive this application on July 12, 2006. The petition was granted by the United States Patent and Trademark Office, and the application was accordingly revived.

39. On July 18, 2007, the United States Patent and Trademark Office issued another Office Action. Applicants filed a Notice of Appeal on January 18, 2008 but then failed to file the required Appeal Brief within the statutory six-month deadline for response. Consequently, the Ianniello '692 application went abandoned for the second time on July 18, 2008; and the United States Patent and Trademark Office mailed a second Notice of Abandonment to Nath confirming the latest abandonment on October 6, 2008.

40. No action was taken by Nath or by AGS to revive this application for almost 11 months after this second abandonment (and nearly a year after this lawsuit was initiated in July 2008, wherein the abandonment of the Ianniello '692 application was contested), when finally on June 12, 2009, the Nath Law Group finally filed a petition to revive this application. As required, the Nath firm certified that "The entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional."

41. Again, it is difficult to conceive of a situation where this application could remain "unintentionally" abandoned for such a long time (and for the *second* abandonment of this case, no less). In view of the pattern of conduct outlined elsewhere herein, and in view of the stakes raised by this litigation, the earlier unintentionality of the abandonment of the Ianniello '692 application (which is a material issue with respect to the ultimate patentability of this application) and the consequent propriety of the revival of this application is cast highly in doubt. Absent a compelling justification for the delay in filing the second petition to revive, the statement of unintentionality would be a misrepresentation, and from the above circumstances, an intent to deceive can be inferred.

42. The principles and opinions set forth in paragraphs 32 and 33 with respect to USSN 10/366,691, above, likewise apply here with respect to USSN 10/366,692.